IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

SUSAN M. HARRIS,
   Plaintiff,

v.                Civil Action No. 3:20-cv-96

MARK R. HERRING, in his official capacity
as Attorney General of Virginia,
   Defendant.

## OPINION

This case involves an employment dispute between the plaintiff, Susan M. Harris, and her employer, Mark R. Herring.[1] Harris, an Assistant Attorney General-III ("AAG-III") at the OAG, contends that the OAG paid her less and assigned her less desirable work than similarly situated male attorneys. She asserts that the OAG retaliated against her after she complained about this alleged mistreatment.[2] The OAG argues that Harris's sex played no part in how it paid or assigned work to her. It also denies Harris's retaliation claim.

Even when viewing the evidence in the light most favorable to Harris, she cannot establish the essential elements of her claims. Her wage discrimination claims fail because she has not identified a similarly situated male comparator whom the OAG paid more. And her disparate

---

[1] Herring oversees the Office of the Attorney General (the "OAG"). Because Harris sues Herring in his official capacity as Virginia's Attorney General, the Court refers to the defendant as the OAG.

[2] Harris brings three claims: wage discrimination, in violation of the Equal Pay Act ("EPA") (Count One); sex discrimination, in violation of Title VII of the Civil Rights Act of 1964 (Count Two); and retaliation, in violation of Title VII (Count Three). Under Count Two, Harris alleges that the OAG discriminated against her by paying her less than men and giving her unfavorable job assignments.

treatment and retaliation claims fail because the OAG did not take adverse action against her. Accordingly, the Court will grant the OAG summary judgment.

## I. BACKGROUND

Harris's current stint at the OAG's office began in December 2005, when the OAG hired her as an Assistant Attorney General in the Criminal Litigation Section of its Criminal Law Division.[3] Between 2005 and 2011, Harris received generally positive reviews from Criminal Litigation Section Chief Jerry P. Slonaker.

That changed after Slonaker retired in 2011. From 2012 to 2015, Harris received performance reviews from Criminal Litigation Section Chief Michael Judge, Criminal Litigation Team Leader Robert Anderson, and Deputy Attorney General Linda Bryant that criticized her writing, courtroom demeanor, and lack of collegiality. Harris's performance did not improve, and in July 2015, Judge recommended Harris's termination.

Instead of firing her, however, the OAG transferred Harris to the Sexually Violent Predators Section. Her performance issues continued there, leading to another transfer—this time to the Financial Recovery Section ("FRS") (formerly known as the Division of Debt Collection ("DDC")) of the Civil Litigation Division.

Near the end of 2017, Rudy Remigio became the FRS Section Chief and Harris's supervisor. From December 19, 2017, to December 19, 2018, Harris "demonstrated a pattern of disrespectful, hostile and otherwise unprofessional communications with" Remigio and her coworkers. (ECF No. 22-18, at 2.) On December 19, 2018, Harris, Remigio, Chief Deputy

---

[3] Harris previously worked at the OAG from 2000 to 2002.

2

Attorney General Cynthia Hudson, and Deputy Attorney General Samuel Towell met to discuss Harris's poor performance.

After the meeting, Remigio sent Harris "a conduct expectations memorandum," which described nine instances of inappropriate behavior by Harris and outlined "specific expectations or measures" with which Harris had to comply. (*Id.* at 1-4.) Specifically, the memorandum required Harris to communicate in writing any disagreements she had with Remigio's supervisory instructions or objections she had to something Remigio or another coworker said or did. (*Id.* at 4.) If Remigio decided that Harris's written concerns warranted an in-person meeting, then Remigio reserved the right to "ask a third party to attend" the meeting "to assist in facilitating a positive discussion." (*Id.*)

After receiving the conduct expectations memorandum, Harris asked to meet with Towell. In the meeting, Harris complained about "disparate" treatment from Remigio and "unfair" work allocation. (ECF 22-19.)[4] In particular, Harris took umbrage with the reassignment of lien cases to "two younger male attorneys" and "that she was not allowed to do more circuit court work." (*Id.*) Towell "noted that work allocation was not what brought about [the conduct expectations memorandum]; it was her communications issues that had brought this about." (*Id.*) He also told her "that Rudy seemed willing to listen to her concerns but that she did not appear willing to listen to him." (*Id.*)

On January 2, 2019, in response to the conduct expectations memorandum, Harris sent a lengthy email to Hudson, Towell, and Remigio. She complained that she "was unprepared for the December 19, 2018 meeting" and "surprised when [she] was not permitted to speak and [Hudson]

---

[4] Harris previously complained about Remigio's alleged "disparate treatment" in a November 16, 2018 email. (ECF No. 32, at 1.)

3

said [she] would like nothing more than to dismiss [Harris] on the spot." (ECF No. 22-20, at 1.) Harris also gave her version of some of the events mentioned in the conduct expectations memorandum and explained her disparate treatment claims. In the email's final paragraph, Harris set forth the gravamen of her complaint:

> In my view, I was attacked in a meeting on December 19, 2018 and by letter on December 21, 2018, without warning, threatened with dismissal, and not allowed to speak, all because I have objected over the last twelve months or so to Mr. Remigio's unjust, disparate treatment. I am in this embarrassing position because I have challenged his decision to take DDC cases from me without cause, an older woman, to reassign them to younger, recently hired, male lawyers. When Mr. Towell finally agreed to speak to me about this on December 21, 2018, he said that Mr. Remigio's decision to reassign my medical lien cases, along with the circuit court cases, in favor of the younger, recently hired, male lawyers, was a section chief's "prerogative."

(*Id.* at 2-3.)

In Harris's 2019 performance evaluation, Towell observed that Harris's performance had somewhat improved. (ECF No. 22-21, at 5.) But Remigio noted that Harris "did not fully meet the expectations of [her] position" because "of insubordinate challenges to the management structure." (*Id.* at 2.) He described three "illustrative" examples of Harris's "improper conduct or communications" and urged her "to continue to work on strategies to avoid improper conduct or communications." (*Id.* at 2-4.) To facilitate this, Remigio required Harris's continued adherence "to the measures listed in the 'Conduct Expectations Memorandum' dated December 21, 2018." (*Id.* at 5.)

On January 1, 2020, Harris became "general counsel for the Unclaimed Property Division of the Department of Treasury," in part because the position would allow her "to operate without day-to-day managerial oversight that has in the past led to conflict." (*Id.* at 2.) A little over a month later, she filed this lawsuit.

4

## II. DISCUSSION[5]

### *A. EPA*

Harris contends that the OAG violated the EPA by paying her less than two similarly situated male attorneys—Lewis Kincer and Joseph Jagdmann.[6] The OAG counters that "Harris's attempt to compare herself to Kincer and Jagdmann falls woefully short of the substantial equality standard necessary to establish a pay discrimination claim." (ECF No. 38, at 1.)

"The EPA prohibits gender-based discrimination by employers resulting in unequal pay for equal work." *EEOC v. Md. Ins. Admin.*, 879 F.3d 114, 120 (4th Cir. 2018). "To establish a prima facie case under the EPA, a plaintiff must demonstrate: (1) the employer paid different wages to an employee of the opposite sex, (2) for equal work on jobs requiring equal skill, effort, and responsibility, which jobs (3) all are performed under similar working conditions." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 196 (4th Cir. 2019). The comparators and the plaintiff "must have virtually identical jobs." *Id.* "Generally, it is not enough to simply show that the comparators hold the same title and the same general responsibility as the plaintiff." *Id.*

---

[5] Rule 56 of the Federal Rules of Civil Procedure directs courts to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a summary judgment motion, the court must draw all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Nevertheless, if the non-moving party fails to sufficiently establish the existence of an essential element to its claim on which it bears the ultimate burden of proof, the court should enter summary judgment against that party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[6] In her complaint, Harris mentions other potential comparators, but she discusses only Kincer and Jagdmann in her opposition brief. The Court, therefore, considers the claims regarding other comparators abandoned. *See Lee v. Belvac Prod. Mach., Inc.*, No. 6:18cv75, 2020 WL 3643133, at *9 (W.D. Va. July 6, 2020) (granting summary judgment to the defendant on claims the plaintiff failed to oppose).

The undisputed evidence shows that Harris, Kincer, and Jagdmann do not "have virtually identical jobs." *Id.* Although Harris, Kincer, and Jagdmann are all attorneys in the OAG,[7] they have different practice areas.[8] During the relevant time period,[9] Harris worked in the Civil Litigation Division's Financial Recovery Section, where she "recover[ed] funds owed to state agencies and institutions of the Commonwealth of Virginia." (ECF No. 22-28, at 1.) Kincer still works in the Civil Litigation Division. But, unlike Harris, he works in the Employment Section's Trial Unit, where he provides "legal services and advice generally associated with, and necessary and appropriate to, civil litigation (with a strong emphasis in the area of employment law)." (ECF No. 22-2, at 1.) Jagdmann works in the Government Operations and Transactions Division's Transportation Section. His "chief objective . . . is to serve as senior counsel to [the Virginia Department of Transporation ("VDOT")] with expertise and experience in VDOT real estate matters, including eminent domain, inverse condemnation, and utilities/right of way matters." (ECF No. 22-39, at 1.)

These different practice areas require different skills. For example, Kincer's position focuses almost exclusively on employment litigation and requires appellate practice. Conversely,

---

[7] As Senior Assistant Attorneys General-I, Kincer and Jagdmann outrank Harris, an AAG-III.

[8] "[J]ob requirements and performance, in actual fact, are controlling, not the mere words of job d[e]scriptions." *Usery v. Bd. of Ed. of Balt. Cnty.*, 462 F. Supp. 535, 559 (D. Md. 1978). Nevertheless, both parties cite exclusively to Harris's, Kincer's, and Jagdmann's job descriptions to establish what their practices entail. Moreover, Harris agrees that her job description accurately describes her position at FRS. (Harris Dep., ECF No. 22-8, at 91:20-92:1.) Accordingly, the Court relies on Harris's, Kincer's, and Jagdmann's job descriptions to determine their jobs requirements.

[9] In her opposition brief, Harris clarifies the scope of her amended complaint; she does not raise any complaints arising after she transferred to the Unclaimed Property Division in January 2020. (ECF No. 23, at 17-18.) Thus, the Court examines only her work in the FRS in its comparative analysis.

6

litigation constituted only one of four areas in Harris's FRS practice, and her position did not require appellate practice. (*Compare* ECF No. 22-2, *with* ECF No. 22-28.) In fact, Harris has acknowledged her and Kincer's dissimilarity. (Harris Dep., ECF No. 22-8, at 140:6-9 ("It's not so much that he's similar; it's just that I'm more skilled, more experienced, more versatile, and I have not been promoted, and I don't know why.").[10]

Likewise, with Jagdmann. As part of his practice, he must "review and prepar[e] . . . deeds, easements, and other real estate documents." (ECF No. 22-39, at 1.) Harris's job at FRS had no such requirement. She also did not need "[k]nowledge of the law in real estate matters including eminent domain, inverse condemnation, utilities/right of way matters, and other real estate matters affecting transportation projects." (*Id.* at 2-3.)

Additional differences distinguish Kincer's and Jagdmann's positions from Harris's position at FRS. For instance, Kincer has mentored younger attorneys; Harris provides no evidence that she has done the same. Moreover, all three attorneys have different supervisors. These myriad differences establish that Harris, Kincer, and Jagdmann did not "have virtually identical jobs." *Evans*, 936 F.3d at 196.

Nevertheless, Harris claims that she, Kincer, and Jagdmann had substantially similar jobs because all three jobs "require substantial litigation, technical legal research and writing skills. They involve equivalent combinations of substantially similar long-range planning, legal analysis, investigation, and court appearance." (ECF No. 23, at 22.)[11] She also notes that all three attorneys

---

[10] Harris's unsubstantiated self-assessment of her skill, experience, and versatility does not factor into the Court's analysis. *See McDougal-Wilson v. Goodyear Tire & Rubber Co.*, 427 F. Supp. 2d 595, 607 (E.D.N.C. 2006) ("Plaintiff's perception of her own experience, performance, and skills is not relevant. It is the perception of the decisionmaker that counts.")

[11] (*See also id.* at 22-23 ("Suffice to say that Ms. Harris'[s] and Mr. Kincer's positions in the civil litigation division of the OAG, and Mr. Jagdmann's position in the Government

7

have similar legal training. Essentially, Harris argues that "at a high level of abstraction" she, Kincer, and Jagdmann all "do the same thing." *Wheatley v. Wicomico County*, 390 F.3d 328, 333 (4th Cir. 2004). "But, the EPA demands more than a comparison of job functions from a bird's eye view." *Id.*

In fact, when deciding a motion for judgment on the pleadings,[12] the Second Circuit rejected an argument nearly identical to Harris's. In that case, the Equal Employment Opportunity Commission ("EEOC") sued the Port Authority of New York and New Jersey (the "Port Authority"), "asserting that the Port Authority paid its female nonsupervisory attorneys at a lesser rate than their male counterparts for 'equal work,' in violation of the" EPA. *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 248-49 (2d Cir. 2014). The EEOC argued that "all lawyers perform the same or similar function(s)" and that "most legal jobs involve the same skill." *Id.* at 257 (internal quotation marks and citations omitted). It also noted that all nonsupervisory attorneys had "similar 'experience, training, education, or ability,' bar admission, and the capacity to call upon 'problem-solving and analytical skills' as well as 'professional judgment.'" *Id.* at 256-57.

The court found, however, that "such bland abstractions—untethered from allegations regarding Port Authority attorneys' *actual* job duties—say nothing about whether the attorneys were required to perform 'substantially equal' work." *Id.* at 257 (emphasis in original). In other words, the high-level generalizations about legal work failed to account for the differences between "handl[ing] complex commercial matters or minor slip-and-falls, negotiat[ing]

---

Operations Division require substantially similar legal skill to litigate cases, draft briefs on contested issues, conduct thorough investigations before trial, and communicate effectively with clients.").)

[12] Courts decide motions for judgment on the pleadings using the same standard as when reviewing Rule 12(b)(6) motions. *Burbach Broad. Co. of Del. v. Elkins Radio Corp.*, 278 F.3d 401, 405 (4th Cir. 2002).

8

sophisticated lease and financing arrangements or respond[ing] to employee complaints, [and] conduct[ing] research for briefs or draft[ing] multimillion-dollar contracts." *Id.* Thus, the court found that the EEOC had not alleged that the Port Authority attorneys performed "substantially equal" work. *Id.*

Like the EEOC in *Port Authority*, Harris contends that she, Kincer, and Jagdmann "perform the same or similar function(s)" by arguing that they all have similar training and use skills common to all lawyers. Her contentions offer only "bland abstractions—untethered from allegations regarding [Harris's, Kincer's, and Jagdmann's] *actual* job duties" and do not show that the lawyers perform substantially equal work. *Id.* Indeed, such a comparison glosses over the differences between debt collection, litigating employment claims, and facilitating real estate transactions. Accordingly, Harris has not alleged that she, Kincer, and Jagdmann performed "substantially equal" work. *Id.*[13]

For these reasons, the Court finds that Harris cannot establish a prima facie EPA claim because she, Kincer, and Jagdmann do not "have virtually identical jobs." *Evans*, 936 F.3d at 196. The Court, therefore, will grant the OAG summary judgment on Harris's EPA claim.

---

[13] The Second Circuit's reasoning in *Port Authority* accords with the Fourth Circuit's admonition that "a plaintiff may not rely on broad generalizations at a high level of abstraction" to establish that she and an alleged male comparator performed equal work. *Spencer v. Va. State Univ.*, 919 F.3d 199, 204-05 (4th Cir. 2019) (rejecting the plaintiff's argument that "all University professors perform equal work because they all perform the same essential tasks," as it impermissibly relied on "broad generalities"); *see also Wheatley*, 390 F.3d at 334 ("[P]laintiffs cannot indiscriminately aim at all department supervisors collectively, and then expect to meet the EPA standard of 'substantial equality [in] skill, effort [and] responsibility'. . . . The inquiry must be more specific." (citations omitted) (quoting *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 827 (6th Cir. 2000)).

9

### B. *Title VII*

Harris asserts three separate Title VII claims. First, she brings a wage discrimination claim, alleging that the OAG paid her "less than similarly situated male attorneys at the OAG." (ECF No. 9 ¶ 59.) Harris also brings a disparate treatment claim. She contends that the OAG, through Remigio, violated Title VII "by assigning medical lien cases to less-qualified and less-senior male attorneys." (*Id.* ¶ 61.)

Finally, Harris argues that Remigio retaliated against her for complaining about alleged disparate treatment by "threaten[ing] termination, a formal disciplinary memorandum, limiting communication to writing, requir[ing] meetings with third parties present, and requir[ing] formal training." (ECF No. 23, at 30.) She further contends that the OAG "stripp[ed] her of caseload responsibility and gradually relegate[ed] her to unclaimed property" in retaliation "for complaining about disparate treatment and for her subsequent complaints of ongoing retaliation." (*Id.*)

#### 1. *Wage Discrimination*

The OAG argues that Harris's wage discrimination claim "fails for the same reasons her EPA claim fails"—namely, her inability to identify a similarly situated comparator. (ECF No. 22, at 26.)

"Where, as here, the prima facie case of wage discrimination is based on comparators, the plaintiff must show that she is paid less than men in similar jobs." *Spencer*, 919 F.3d at 207. Unlike under the EPA, "Title VII requires the compared jobs to be only 'similar' rather than 'equal.'" *Id.* Despite this difference, "Title VII's 'similarity' requirement . . . is not toothless: the plaintiff must provide evidence that the proposed comparators are not just similar *some* respects, but 'similarly-situated *in all respects.*'" *Id.* at 207-08 (emphasis in original) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

To determine whether a plaintiff and her comparator have similar jobs, "courts consider 'whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision.'" *Id.* (quoting *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005)).

Even under Title VII's more lenient similarity requirement, Harris fails to establish a prima facie case of wage discrimination. First, Harris, Kincer, and Jagdmann all have different job descriptions. (*Compare* ECF No. 22-28, *with* ECF Nos. 22-2, 22-39.) Second, as detailed above, Harris's, Kincer's, and Jagdmann's jobs have different objectives, tasks, duties, and necessary skills. Third, Harris, Kincer, and Jagdmann have different supervisors. Finally, Harris, Kincer, and Jagdmann do not have comparable experience. For instance, Kincer specializes in employment litigation, whereas Harris has never worked in the Employment Unit or Trial Section of the Civil Litigation Division. And, unlike Jagdmann, she has never worked in the OAG's Transportation Section and "has never handled real estate, eminent domain, inverse condemnation, or utilities matters at the OAG." (ECF No. 22, at 17-18.)

Harris, therefore, has not identified similarly situated male comparators whom the OAG paid more than her. Accordingly, the Court will grant summary judgment to the OAG on her Title VII wage discrimination claim.

### 2. *Disparate Treatment*

The OAG argues that Harris's disparate treatment claim fails because, among other things, "mere gripes concerning work assignments do not amount to actionable adverse action." (ECF No. 22, at 27.)

11

To establish a prima facie case for disparate treatment, Harris must establish "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494, 506 (D. Md. 2019) (quoting *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010)).

As relevant here, "[a]n adverse employment action is a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" *Supinger v. Virginia*, 167 F. Supp. 3d 795, 807 (W.D. Va. 2016) (quoting *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004)). "[R]eassignment to a less appealing job is not an adverse employment action unless it has a 'significant detrimental effect,' such as a 'decrease in compensation, job title, level of responsibility, or opportunity for promotion.'" *Gordon v. Gutierrez*, No. 1:06cv861, 2007 WL 30324, at *7 (E.D. Va. Jan. 4, 2007) (quoting *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999)). Similarly, a "plaintiff's dissatisfaction with the work she received[] do[es] not rise to the level of an adverse employment action." *Id.* at *8.

Here, Harris complains that Remigio unfairly reduced her workload and responsibility in FRS "by assigning medical lien cases to less-qualified and less-senior male attorneys." (ECF No. 9 ¶ 61.) Remigio's case assignment decisions did not cause a "decrease in compensation, job title, level of responsibility, or opportunity for promotion." *Boone*, 178 F.3d at 256-57. Thus, her complaints amount to nothing more than dissatisfaction with her work assignments. This does "not rise to the level of an adverse employment action." *Gordon*, 2007 WL 30324, at *8. Indeed, "even assuming [Harris] received a somewhat less desirable mix of assignments than others in [FRS], this would not constitute an adverse employment action" because "Title VII simply does

12

not address the 'trivial discomforts endemic to employment,' a moniker which befits the differences in assignments complained of here." *Id.* (quoting *Boone*, 178 F.3d at 256).

Simply put, Harris's "subjective dissatisfaction with her work assignments is not actionable when it produced no detrimental effect on the terms or conditions of her employment." *Id.* The Court, therefore, will grant the OAG summary judgment on her disparate treatment claim.

### 3. Retaliation

The OAG asserts that Harris's retaliation claim fails because she "has not alleged an actionable adverse action," and, even if she did, she "cannot show that any alleged protected activity was the but-for cause of an adverse action." (ECF No. 22, at 29.)

Absent direct evidence, a plaintiff suing for retaliation under Title VII must establish that "(1) she engaged in a protected activity;" (2) her employer took materially adverse action against her; and (3) the protected activity caused the adverse action. *Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018) (quoting *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008)). Protected activity includes complaints about "actions that are not actually unlawful under Title VII," as long as the employee holds "'an objectively reasonable belief that . . . a Title VII violation has happened or is in progress.'" *Id.* at 327 (quoting *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 282 (4th Cir. 2015) (en banc)). Thus, complaining to supervisors about possible Title VII violations can constitute protected activity. *See Ingleson v. Burlington Med. Supplies, Inc.*, 141 F. Supp. 3d 579, 583-84 (E.D. Va. 2015). The second element creates a less restrictive standard than the adverse employment action requirement in other contexts. *Hinton v. Va. Union Univ.*, 185 F. Supp. 3d 807, 825-31 (E.D. Va. 2016). In retaliation cases, an employer's conduct must be "so materially adverse as to dissuade a reasonable employee from engaging in protected activity." *Id.* at 834.

13

Finally, a plaintiff alleging retaliation must show that her protected activity serves as the "but-for" cause of her employer's adverse action. *Ingleson*, 141 F. Supp. 3d at 583.

Harris claims that "[t]hreatened termination, a formal disciplinary memorandum, limiting communication to writing, required meetings with third parties present, and required formal training" "would deter a reasonable employee from complaining to her employer." (ECF No. 23, at 30.) The Court disagrees.

First, courts in this circuit have repeatedly held that proposed termination, reprimands, performance improvement plans, and negative performance evaluations do not constitute materially adverse action.[14] In addition, Harris had performance issues that threatened her continued employment at the OAG *before* she complained about disparate treatment.

Further, the provisions in the conduct expectations memorandum that required Harris to communicate disagreement with Remigio and her colleagues in writing and gave Remigio the right to have a third party present if he and Harris met regarding those disagreements would not "dissuade a reasonable employee from engaging in protected activity." *Hinton*, 185 F. Supp. 3d at 834. If anything, these measures, by explicitly articulating a procedure by which she could air

---

[14] *See Parsons v. Wynne*, 221 F. App'x 197, 198-99 (4th Cir. 2007) (finding that neither a poor performance evaluation nor a change in work schedule "would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination'" (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006))); *Wilson v. City of Chesapeake*, 290 F. Supp. 3d 444, 462 (E.D. Va. 2018) (finding that negative performance reviews and "being given marginally fewer opportunities" to assume extra duties did not count as materially adverse action); *Hinton*, 185 F. Supp. 3d at 832 ("[R]eprimands without collateral consequences cannot be characterized as 'adverse.'"); *Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F. Supp. 2d 480, 492 (D. Md. 2013) ("[N]one of the following constitutes an adverse employment action in a retaliation claim: . . . issuing a personal improvement plan, . . . a verbal reprimand, a formal letter of reprimand, or a proposed termination" (internal quotation marks and citations omitted)); *Rock v. McHugh*, 819 F. Supp. 2d 456, 470-71 (D. Md. 2011) (a performance improvement plan, a verbal warning, a counseling letter, a formal letter of reprimand, and proposed termination do not constitute adverse actions).

14

her grievances, would encourage Harris to engage in protected activity. Indeed, by outlining how Harris could disagree with him, Remigio implicitly approved of such protected behavior. Essentially, Harris argues that her inability to initially raise complaints verbally would dissuade her from raising the complaints at all. This argument lacks merit.

Finally, Harris complains that the OAG "stripp[ed] her of caseload responsibility and gradually relegate[ed] her to unclaimed property" in retaliation "for complaining about disparate treatment and for her subsequent complaints of ongoing retaliation." (ECF No. 23, at 30.) But "a reasonable person would not consider [Harris]'s reduced case load with no change in her salary to be materially adverse." *Yon v. Reg'l Med. Ctr.*, No. 5:14-2098, 2016 WL 11410314, at *17 (D.S.C. Feb. 10, 2016).

And even if Harris could identify a materially adverse action, she could not establish but-for causation because she cannot show "that [retaliation] was the real reason for the challenged conduct." *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015) (alteration in original) (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)). The OAG has produced ample evidence to show that it threatened to fire Harris, reprimanded her, and required her to undergo additional training for a legitimate, nondiscriminatory reason—her poor performance. The evidence also shows that the OAG required Harris to communicate disagreement with Remigio and her colleagues in writing and gave Remigio the right to have a third party present if he and Harris met regarding those disagreements in hopes of rectifying her poor interpersonal communication skills. Finally, Remigio reassigned Harris's lien cases so that she could provide temporary support to a colleague in the Unclaimed Property Division without her "lien cases falling behind." (ECF No. 22-22, at 4.)

15

Harris alleges that the OAG conjured up multiple years of performance issues as a pretext for their alleged retaliation.[15] But she cites no evidence to support these allegations. Accordingly, even if Harris could establish that she suffered a materially adverse action, which she cannot, she could not satisfy the but-for causation prong of a Title VII retaliation claim.

For these reasons, the Court will grant the OAG summary judgment on Harris's retaliation claim.

### III. CONCLUSION

The undisputed material facts entitle the OAG to summary judgment on all counts. Accordingly, the Court will grant summary judgment for the OAG.

The Court will enter an appropriate order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 12 January 2021
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge

---

[15] Harris inaccurately states that "the OAG only found it necessary to criticize Ms. Harris'[s] performance *immediately after* she reported disparate treatment and *after* the OAG had already begun reducing Ms. Harris's caseload and consigning her cases to younger male attorneys." (ECF No. 23, at 30.)

16